James George GUEVARA, Appellant,

v.

The STATE of Texas.

No. 0424–03.

Court of Criminal Appeals of Texas.

Oct. 20, 2004.

Rehearing Denied Jan. 12, 2005.

Nancy B. Barohn, San Antonio, for Appellant.

Daniel Thornberry, Asst. District Atty., San Antonio, Matthew Paul, State's Atty., Austin, for State.

## OPINION

PRICE, J., delivered the opinion of the court, in which KELLER, P.J., and MEYERS, WOMACK, JOHNSON, KEASLER, HOLCOMB, and COCHRAN, JJ., joined.

The appellant challenges his conviction for murder, claiming that the evidence pre-

sented at trial was insufficient to support his conviction as a party to the offense. The State challenges the judgment of the Court of Appeals with respect to the Court's harm analysis on jury-charge error. We conclude that the evidence was legally sufficient to support the appellant's conviction under Texas Penal Code Sections 7.02(a)(2) and 19.02(b). And we hold that the correct standard of review for jury-charge error is Article 36.19 of the Code of Criminal Procedure. We therefore affirm the Court of Appeals on the former issue and reverse on the latter.

## I. Facts and Procedural Background

On May 26th, 1993, Minnie Salinas, the appellant's mistress, shot and killed Velia Guevara, the appellant's wife. Sometime before 9:00 a.m., Kathleen Cadena, the property manager at the appellant's apartment complex, received a call from an answering service, which reported several calls about a car with its lights on that belonged to the tenant in apartment 424, the appellant's apartment. At 9:00 a.m., Cadena received another similar call, and Shelley Selzor, the leasing agent, took another call about fifteen minutes later. Cadena told Selzor to contact Velia.

Cadena said a woman, later identified as Minnie Salinas, came by the office at about 8:45 a.m. The office was not yet open, so the woman returned between 9:15 and 9:30 a.m. The woman asked to use the phone. Cadena offered the office phone, but the woman asked for a pay phone. Cadena directed the woman to the pay phone at the back of the club house. The woman was gone for a short time, and then came back through the leasing office without stopping. George Garza, the maintenance man, also recalled seeing the woman. At about 10:00 a.m., Velia came to the leasing office to say her car lights were not on. That was the last time she was seen alive.

The appellant had left the apartment early that morning and played golf until about 1:00 or 2:00 p.m. Then he spent the next three hours at the San Antonio Light career services office pursuing prospective employment opportunities. At about 4:00 p.m., he returned to his apartment, where he found his wife inside the apartment, lying dead on the hallway floor.

During the trial, there was no dispute by either the appellant or the State that Salinas was the principal actor in the commission of the murder. There was also no dispute that the appellant had an alibi for the time when Velia was shot. Since the appellant had an alibi for the time of the murder, the State had to prove that he was criminally responsible for Salinas's actions in committing the murder.

The Texas Penal Code provides three separate ways by which a person can be criminally responsible for the conduct of another.[1] The first way encompasses a situation in which a person causes an innocent person to engage in criminal conduct.[2] The second situation occurs when a person "solicits, encourages, directs, aids, or attempts to aid" another person in committing an offense.[3] The last situation allows a person to be convicted of a crime if he does not make a reasonable effort to prevent the commission of an offense when he has a legal duty to prevent the commission of that offense.[4]

---

1. Tex. Pen Code § 7.02(a).

2. Tex. Pen.Code § 7.02(a)(1).

3. Tex. Pen.Code § 7.02(a)(2). We refer to this section as the "aiding" theory of criminal responsibility for the conduct of another.

4. Tex. Pen.Code § 7.02(a)(3). We refer to this section as the "legal-duty" theory of criminal responsibility for the conduct of another.

The State relied on Section 7.02(a)(2) of the Penal Code to show that the appellant was criminally responsible for Salinas's actions in murdering Velia. The State's theory of the case was that Salinas and the appellant together plotted to kill Velia.

There was no evidence presented at trial that suggested the State relied on the legal-duty theory to find the appellant to be criminally responsible in the death of his wife. However, in the abstract portion of the jury charge, the party-liability instruction included both the aiding language from Section 7.02(a)(2) and the legal-duty language from Section 7.02(a)(3). From the record, it appears that neither the appellant nor the State requested or objected to the inclusion of the legal-duty language in the charge.

On direct appeal, the appellant challenged, inter alia, the legal sufficiency of the evidence and the inclusion of the legal-duty language in the jury charge. The appellant argued that the inclusion allowed the jury to convict him for conduct that was not illegal since he had no legal duty to prevent the murder of his wife, and moreover, the misstatement of the law deprived him of a fair and impartial trial.

The Court of Appeals held the evidence presented at trial was legally sufficient to convict the appellant on the aiding theory of being a party to an offense.[5] Therefore, the Court declined to address the sufficiency of the evidence under a legal-duty theory of liability.

In addressing the jury-charge error, the Court of Appeals initially found it to be harmless. However, on the appellant's motion for rehearing, the Court of Appeals en banc held that the error was harmful based on its opinion in *Bagheri v. State.*[6]

The Court of Appeals determined that the harm analysis should be conducted under Texas Rule of Appellate Procedure 44.2(b). Under Rule 44.2(b), a non-constitutional error must be disregarded unless it affects a defendant's substantial rights. Using this analysis, the Court of Appeals determined that the submission of the legal-duty theory affected appellant's substantial rights, and therefore remanded the case for a new trial.

We granted both the State's and the appellant's petitions for discretionary review to determine (1) whether the evidence presented was sufficient to support the verdict, (2) whether the Court of Appeals applied the correct harm analysis to the jury-charge error, and, if so, (3) whether the Court of Appeals erred in holding that the appellant was harmed.[7]

## II. Legal Sufficiency of the Evidence

■ First, we address the appellant's assertion that the evidence was legally insufficient to support the conviction due to the impermissible stacking of inferences,

---

5. *Guevara v. State,* 103 S.W.3d 549, 555 (Tex. App.-San Antonio 2003).

6. 87 S.W.3d 657 (Tex.App.-San Antonio 2002), *aff'd,* 119 S.W.3d 755 (Tex.Crim.App. 2003).

7. The precise grounds upon which we granted review include whether the court of appeals erred by: (1) performing a harm analysis of jury-charge error by applying Rule 44.2(b) of the Rules of Appellate Procedure instead of Article 36.19 of the Code of Criminal Procedure, as construed by *Almanza v. State;* (2) reversing appellant's conviction because the jury might have convicted appellant on one erroneous theory of the offense where there was sufficient evidence to sustain the conviction under an alternative theory; and (3) finding that the State's evidence was legally sufficient to support appellant's conviction where legal sufficiency necessarily depended upon a theory of conduct that was not unlawful or, alternatively, upon the impermissible stacking of inferences.

or alternatively, because the conviction rested on conduct which was not illegal.[8]

### A. Standard of Review

The Fourteenth Amendment's guarantee of due process of law prohibits a criminal defendant from being convicted of an offense and denied his liberty except upon proof sufficient to persuade a rational fact finder of guilt beyond a reasonable doubt.[9] In assessing the legal sufficiency of the evidence to support a conviction, we consider all the record evidence in the light most favorable to the jury's verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational jury could have found the accused guilty of all of the elements of the offense beyond a reasonable doubt.[10] Furthermore, when the trial court's charge authorizes the jury to convict on more than one theory, as it did in this case, the verdict of guilty will be upheld if the evidence is sufficient on any one of the theories.[11] The law does not require any further speculation as to the guilt of the appellant. If, given all of the evidence, a rational jury would *necessarily* entertain a reasonable doubt as to the defendant's guilt, the due process guarantee requires

that we reverse and order a judgment of acquittal.[12]

### B. The Aiding Theory

The appellant contends that the evidence was legally insufficient to convict him due to the impermissible stacking of inferences. The evidence used to convict the appellant was solely circumstantial. However, the lack of direct evidence is not dispositive of the issue of a defendant's guilt. Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor.[13] Circumstantial evidence alone is sufficient to establish guilt.[14] Furthermore, the standard of review on appeal is the same for both direct and circumstantial evidence cases.[15]

In reviewing the sufficiency of the evidence, we should look at "events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." [16] Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative effect of all the incriminating facts are sufficient to support the conviction.[17]

8. If the evidence is insufficient to sustain the conviction, then we need not address the other issues presented in the State's petition for discretionary review.

9. *In re Winship*, 397 U.S. 358, 362, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

10. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Ladd v. State*, 3 S.W.3d 547, 557 (Tex.Crim.App. 1999).

11. *Rabbani v. State*, 847 S.W.2d 555, 558 (Tex.Crim.App.1992).

12. *Narvaiz v. State*, 840 S.W.2d 415, 423 (Tex. Crim.App.1992) (emphasis added).

13. *Templin v. State*, 711 S.W.2d 30, 33 (Tex. Crim.App.1986).

14. *Miles v. State*, 73 Tex.Crim. 493, 165 S.W. 567, 570 (Tex.Crim.App.1914).

15. *Carlsen v. State*, 654 S.W.2d 444, 449 (Tex. Crim.App.1983); *Freeman v. State*, 654 S.W.2d 450, 456 (Tex.Crim.App.1983); *Denby v. State*, 654 S.W.2d 457, 464 (Tex.Crim.App. 1983); *Wilson v. State*, 654 S.W.2d 465, 471 (Tex.Crim.App.1983).

16. *Cordova v. State*, 698 S.W.2d 107, 111 (Tex.Crim.App.1985); *Thompson v. State*, 697 S.W.2d 413, 416 (Tex.Crim.App.1985).

17. *Alexander v. State*, 740 S.W.2d 749, 758 (Tex.Crim.App.1987); *Russell v. State*, 665 S.W.2d 771, 776 (Tex.Crim.App.1983) (The evidence is sufficient "if the conclusion [of guilt] is warranted by the combined and cu-

Motive is a significant circumstance indicating guilt.[18] Intent may also be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant.[19]

The evidence demonstrated that the appellant had a motive to kill his wife. The appellant was involved in a long-standing affair with Salinas, which was consummated three days before he married Velia. Three years after the affair began, and one month before the murder, Salinas issued an ultimatum to the appellant that they would separate "if something didn't happen by June." The appellant was distressed over this, and stated that he "didn't want to give Minnie [Salinas] up and couldn't think of a way to end it." The appellant apparently did not want to divorce Velia because he did not want to cause his family distress.[20] He and Salinas also talked about getting married, but the appellant stated that he "didn't see how it was possible." Velia had a substantial retirement account that was to go to the appellant in the event of her death. Once the money was certain to go to the appellant,[21] Salinas and the appellant almost immediately got married in Las Vegas. These facts show that the appellant had a strong motive for murdering his wife.

Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt.[22] Lies about an actor's relationship with an accomplice are probative of unlawful acts.[23]

The appellant made several false statements to the authorities. When the appellant gave his first statement to the police, he claimed that he and Velia had a good relationship with no problems and that no one else had any problems with Velia. He mentioned Salinas's name in the statement, but only as a person to whom he lent a gun, not as a person with whom he was having an affair, and not a person whom he knew had a motive to kill Velia. It was only after the police discovered his omissions and confronted him with them that he detailed his relationship with Salinas. The appellant later lied about his relationship with Salinas during a deposition taken for a civil case.

On the day of the murder, the appellant claimed that he dropped Salinas off at work at 6:30 am, but Salinas called in sick and did not arrive at work until later in the day. The appellant explained that he had to drive Salinas to work because she told him that her car had been stolen two days before the murder. However, Salinas rented a car *five* days before the murder. Then, on the day of the murder, after the murder had occurred, she extended her rental contract and switched to

mulative force of all the incriminating circumstances.'').

**18.** *Harris v. State,* 727 S.W.2d 537, 542 (Tex. Crim.App.1987).

**19.** *Patrick v. State,* 906 S.W.2d 481, 487 (Tex. Crim.App.1995).

**20.** Apparently, the appellant's brother had recently gotten divorced. The appellant's parents took the brother's divorce extremely hard. Therefore, the appellant said he did not want to put his parents through another divorce.

**21.** Velia's family filed a civil suit to prevent appellant from receiving the retirement benefits, due to his alleged involvement in her death. The civil suit was subsequently dropped so the criminal investigation would not be impeded.

**22.** *Graham v. State,* 566 S.W.2d 941, 951 (Tex.Crim.App.1978); *United States v. Cano-Guel,* 167 F.3d 900, 905 (5th Cir.1999).

**23.** *Hartson v. State,* 59 S.W.3d 780, 788 (Tex.App.Texarkana 2001, no pet.).

a different rental vehicle. Later, when Salinas's car was recovered, it showed no signs of having been stolen. Based on the appellant's inconsistent statements, it would be reasonable for a jury to conclude that he attempted to mislead the police about driving Salinas to work and about her access to transportation.

In addition to the evidence of motive and inconsistent statements, other evidence was presented that suggested the appellant's complicity in the crime. One month before the murder, the appellant took Velia to a shooting range to practice firing a rented 9mm gun, the same caliber gun that was used in the murder. He also told a friend, Paul Knauss, that he was researching how to make a silencer. The day of the murder, the appellant ensured that he had an alibi for the time of the murder because he was playing golf with Knauss. Knauss testified that it was out of character for the appellant to ask him to play golf. It was unusual because Knauss was a bad golfer and appellant had, on previous occasions, said that people who could not shoot under 100 should not be allowed to play on eighteen-hole golf courses because they slow everyone down. It had also been some period of time since the appellant had played golf with Knauss, and on previous occasions, they played only par-three courses or went to the driving range. The jury could have reasonably concluded that the appellant was attempting to manufacture an alibi so the police would not be able to connect him to the murder.

The police found two casings in the appellant's car and a third casing on the couch in the appellant's apartment that were all fired from the same gun. Velia was shot three times. The firearms expert testified that the casing found on the couch was probably ejected from the murder weapon when Velia was shot. Knauss testified that the casings were not in the appellant's car earlier in the day during the golf outing. In addition, the police found a box of shell casings under some clothes in the appellant's closet, thirty of which matched the casings from the murder scene and the appellant's car. After the appellant discovered his wife's body, he had access to both the apartment and his car before emergency personnel arrived. The appellant had opportunity to retrieve two casings from the crime scene and put them in his car, hoping to conceal evidence. Presumably, he did not notice the third casing which was found in an inconspicuous location. The jury could reasonably conclude that the shell-casing evidence connected the appellant to the murder weapon.

During the trial, the State claimed that Velia had been lured from her apartment with a phone call so Salinas could surreptitiously enter the Guevara's apartment using a key from the appellant. There was no sign of forced entry into the apartment, nor was anything stolen, despite the obvious presence of valuables. The lack of evidence of burglary suggested that the murder was pre-meditated, not a robbery gone bad. Finally, the appellant showed little to no emotion after discovering his wife, nor did he appear to be upset at the crime scene.

 The appellant argues that in order to be convicted as a party to the murder, there must be proof that he was assisting in the commission of the offense at the time it was actually committed and that he had knowledge that he was assisting in the commission of the offense. However, the Penal Code does not require that the party actually participate in the commission of

the offense to be criminally responsible.[24] The Penal Code also does not require that a party to the crime be physically present at the commission of the offense.[25]

Based on the totality of the evidence, a jury could have reasonably concluded that the appellant was a participant in the murder of his wife and that he knew he was assisting in the offense. While each piece of evidence lacked sufficiency in isolation, the consistency of the evidence and the reasonable inferences drawn therefrom were sufficient to support the verdict. Therefore, after examining all the evidence in the case in the light most favorable to the prosecution, we conclude that a rational jury could have found all the elements proved, based on the aiding theory of party responsibility, beyond a reasonable doubt.

### C. The Legal–Duty Theory

The appellant alternatively alleges that his conviction was based on conduct that was not illegal. The rationale for this claim is that, because the appellant had no legal duty to prevent his wife's murder, he could not be convicted on a legal-duty theory of liability. Regardless of whether the appellant had or did not have a legal duty to prevent injury to his wife,[26] the evidence was sufficient to support the State's other theory of the case, that the appellant aided Salinas in murdering Velia. We have consistently held that, when multiple theories are submitted to the jury, the evidence is sufficient to support a conviction so long as the evidence is sufficient to support conviction for one of the theories submitted to the jury.[27]

### III. The Jury Charge

■■■ The appellant argued in the Court of Appeals that, because the jury charge included language that allowed the jury to convict him based on either a legal-duty theory *or* an aiding theory, it is unknown under which theory the jury convicted. Therefore, since the jury could not have *legally* convicted him on legal-duty theory, and there is a possibility that they did, the appellant argues that the verdict cannot stand. So despite the fact that the conviction may be upheld under the aiding theory, we still must decide if the error in the jury charge affected the appellant's trial in such a way that his conviction should be reversed.[28]

---

24. *Cross v. State,* 550 S.W.2d 61, 63–64 (Tex. Crim.App.1977) (The defendant was criminally responsible as a party because he planned the robbery with the actual robbers, even though the defendant did not actually participate in the robbery).

25. *Morrison v. State,* 608 S.W.2d 233, 234 (Tex.Crim.App.1980).

26. While generally a spouse does not have a legal duty to prevent harm to the other spouse, there can be circumstances under which one spouse could have a legal duty to the other. For example, if one spouse was a law enforcement official, he or she would have a legal duty to prevent a crime from being perpetrated on the other spouse. *See Medrano v. State,* 612 S.W.2d 576, 578 (Tex. Crim.App.1981). Another example could

arise where one spouse is incapacitated and the other spouse has legal guardianship of the incompetent one. However, there was no evidence presented in this case that the appellant and his wife fell into any of these categories. The question of legal duty between spouses also arises in civil litigation. *See Rampel v. Wascher,* 845 S.W.2d 918, 925 (Tex. App.-San Antonio 1992, writ denied) ("spouses and other family members have no legal right of action against each other arising from failure to take affirmative action to prevent injury").

27. *Kitchens v. State,* 823 S.W.2d 256, 258 (Tex.Crim.App.1991).

28. We do not address whether the inclusion of the legal-duty theory in the charge was error.

The Court of Appeals applied Texas Rule of Appellate Procedure 44.2(b) to the jury charge in its harm analysis. On original submission, the Court of Appeals held that the jury-charge error in this case was harmless because, although an erroneous theory of culpability was submitted to the jury, there was sufficient evidence to convict appellant under a valid theory. The en banc Court of Appeals granted the appellant's motion for rehearing and reviewed its holding based on their decision in *Bagheri v. State.*[29] Based on its reasoning in *Bagheri*, the Court of Appeals applied Rule of Appellate Procedure 44.2(b) and concluded that the error affected the appellant's substantial rights. The Court of Appeals reversed the conviction. We must determine whether the harm analysis used in *Bagheri* was the appropriate one under which the jury-charge error in this case should be reviewed.

*Bagheri* involved a driving while intoxicated conviction in which retrograde extrapolation evidence was erroneously submitted to the jury.[30] The jury was charged with alternative theories of intoxication: (1) absence of the normal use of mental or physical faculties and (2) a blood-alcohol concentration of 0.10.[31] It was unclear under which theory the jury convicted the defendant.[32] Without the erroneous admission of evidence, one of the

two theories could not legally have been the basis for a conviction due to insufficient evidence.

■ In conducting a harm analysis in *Bagheri*, the Court of Appeals relied on Rule 44.2(b) of the Rules of Appellate Procedure.[33] According to Rule 44.2(b), non-constitutional errors must be disregarded if the error did not affect the appellant's substantial rights. "Substantial rights are not affected by the erroneous admission of evidence 'if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect.'"[34] The Court of Appeals concluded that it could not tell whether the erroneous admission of evidence "did not influence the jury, or have but a slight effect," and therefore, held the error to be harmful.[35]

We affirmed the lower court, holding that, although the Court of Appeals reached the correct conclusion in *Bagheri*, its reasoning was flawed.[36] The Court of Appeals based their holding on the fact that the general verdict made it impossible to determine which theory the jury had relied on.[37] We stated that "this fact alone is not determinative, because evidence to prove intoxication under either definition is relevant to the single question of whether

---

29. 87 S.W.3d 657 (Tex.App.-San Antonio 2002), *aff'd*, 119 S.W.3d 755 (Tex.Crim.App. 2003).

30. *Id.*, at 659.

31. Under the version of Penal Code Section 49.01 in effect when Bagheri was arrested, a person could be shown to be intoxicated for (1) the impairment of physical or mental faculties or (2) having a blood-alcohol content over 0.10. That section has been amended so that a person may be shown to be intoxicated if he has a blood-alcohol concentration of 0.08. Act of May 11, 1999, 76th Leg., R.S., ch. 234, § 1, 1999 Tex. Gen. Laws 1082.

32. *Id.*, at 660.

33. *Id.*, at 659.

34. *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim.App.2001).

35. *Bagheri*, 87 S.W.3d at 661.

36. *Bagheri v. State*, 119 S.W.3d 755, 763 (Tex. Crim.App.2003).

37. *Ibid.*

the appellant was, in fact intoxicated."[38] After reviewing the record for the relevant factors outlined in *Motilla v. State*[39] and *Solomon v. State, supra,* we held that we could not determine whether the erroneous admission of evidence "prejudiced the jury's consideration of the other evidence or substantially affected their deliberation."[40]

The Court of Appeals in the instant case used the same harm analysis as it did in its *Bagheri* opinion. The harm analysis under Rule 44.2(b) was appropriate in *Bagheri* because the issue involved the erroneous admission of evidence and its effect on the jury's deliberations.

This case is distinguishable from *Bagheri.* The issue in the appellant's case is whether an *erroneous theory in the jury charge* affected the verdict, not whether the *erroneous admission of evidence* affected the verdict. It is settled law in Texas that error in a criminal jury charge is reviewed under Article 36.19 of the Code of Criminal Procedure as interpreted by this Court in *Almanza v. State.*[41] As a result, we hold that the Court of Appeals erred in assessing harm under the standard found in Rule 44.2(b).

### III. Conclusion

We hold that the Court of Appeals did not err in holding that the evidence was legally sufficient to support the conviction. We also hold that the Court of Appeals erred in using Rule 44.2(b) as the standard by which to assess harm for the jury-charge error. As a result of this holding, we need not address whether the Court of

Appeals erred in concluding that the appellant was harmed. We reverse the judgment of the Court of Appeals and remand the case to that Court to conduct a harm analysis under Code of Criminal Procedure 36.19.

HERVEY, J., did not participate.

sufficient evidence to prove one of the alleged means by which the appellant committed the offense, but instead whether the erroneous admission of evidence affected the verdict. *Id.* at 762 n. 5.

---

**38.** *Ibid.*

**39.** 78 S.W.3d 352, 355 (Tex.Crim.App.2002).

**40.** *Bagheri,* 119 S.W.3d at 763. We noted that the issue in *Bagheri* was not whether the jury charge set out valid and proper means of committing the offense, or whether there was

**41.** 686 S.W.2d 157 (Tex.Crim.App.1985).