Opinion
Issued May 6, 2010

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 


 
 

 
 



NO. 01-09-00108-CR

 


 
 

 
 



DAVID FRANCIS ANDERSON, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 


 
 

 
 
 



On Appeal from the 248th District Court

Harris County, Texas

Trial Court Cause No. 1152878

 


 
 

 
 
 



MEMORANDUM OPINION

A jury found appellant, David Francis
Anderson, guilty of the offense of murder[1]
and assessed his punishment at confinement for seventy-nine years and a fine of
$10,000.  In ten points of error,
appellant contends that the evidence is legally and factually insufficient to
support his conviction and the trial court erred in admitting certain hearsay
and irrelevant evidence, permitting the State to make improper jury arguments,
and instructing the jury that it could consider the prior relationship, if any,
between appellant and Amy Smith, the complainant.[2]

          We
affirm.

Background

In State’s
Exhibit No. 3, a recording of a telephone call made by appellant to an
emergency assistance operator on February 7, 2008 at approximately 5:00 a.m., appellant
exclaimed,

Somebody came in our house
and I wasn’t around and my girlfriend is laying on the ground with a bullet in
her head.  I don’t know what . . .
happened . . . The door is unlocked . . . There was like three or four black
males . . . it happened about ten minutes ago . . . Someone tried to come in
here and rob us . . . I don’t know if she got shot . . . I’m not [there] . . .
if they’re robbing her, they’ll kill everyone . . . Four nights ago, they
kicked in my door . . . and . . . they pointed shot guns at us   . . . [the robbers] took off running . . . [The
victim’s] name is Amy and she has a very, very, very, very, . . . bad temper.

 

Houston
Police Department (“HPD”) Officer K. Montague testified that on February 7,
2008, he was dispatched to appellant’s apartment in response to the emergency
assistance call.  As he approached the
apartment, he noted that the windows were undamaged and the door “appeared
intact” and “secure” but “unlocked.”  Montague
opened the door, walked into the living room, and saw “narcotics on the coffee
table,” including marijuana and “some pills.” 
He then went into the bedroom, where he found the complainant, barely breathing,
with a gunshot wound to her head.  Although
there were no firearms in the apartment, Montague found “a nylon holster” for a
pistol in the couch.  Neighbors gave
Montague the description of “David,” who lived in the apartment. 

At approximately
6:52 a.m., Officer Montague saw appellant, who matched the description given to
him, walking in the parking lot.  After
appellant tried to avoid him, Montague called out, “come here,” and appellant
did.  Appellant, who was “rather calm,”
asked Montague what had happened.  Montague
responded that appellant’s girlfriend had been shot, but appellant did not seem
surprised.  Montague then patted
appellant down for weapons, “not knowing if he was [a] suspect,” and put him in
the back of his patrol car “not handcuffed.”

HPD Homicide
Investigator R. Swainson testified that he was dispatched to the apartment
complex to investigate the complainant’s death. 
When he arrived, Swainson approached appellant, who was waving at him
from the back of Montague’s patrol car.  After
appellant asked Swainson if his girlfriend was “okay,” he stated “they kicked
in the door” and “she was shot in the head.” 
Appellant told Swainson that he had some firearms located at the
apartment of Kelly Kelso, an acquaintance. 
Swainson subsequently recovered from Kelso’s apartment appellant’s
assault rifle, .22 caliber semi-automatic pistol, and .38 caliber revolver
loaded with five chambered rounds.

Kelly Kelso
testified that on February 7, 2008, at approximately 6:00 a.m., appellant came
to her apartment, “banged” on the door, and “asked to drop something off.”  Appellant, who appeared “very nervous and
kind of freaked out,” brought into her apartment “a large object.”  Appellant left and immediately returned
carrying something that appeared to have “the end of a gun” sticking out of it.  Upon examining the items, Kelso discovered
“two guns” and a third “big gun,” which were later recovered by Investigator
Swainson.

HPD Crime Scene
Investigator L. Verbitskey testified that the jamb and locking mechanism for
the front door of appellant’s apartment were intact and the windows were unbroken.  He opined that there did not appear to have
been a forced entry.  In the pantry, Verbitsky
found seventeen live bullets, including some .38 caliber.  In the living room, he found a “green leafy
substance,” which appeared to be marijuana, on the coffee table, and additional
live bullets.  

Harris
County Medical Examiner Dr. Pramod Gumpeni, who performed the autopsy of the
complainant’s body, testified that the complainant suffered from an “entrance
gunshot wound” just over her left eye with evidence of “stippling” on her “left
forehead, part of her nose and her eye.” 
He explained that “stippling,” or “burns,” are caused by gunpowder when a
firearm is discharged within four to eighteen inches of a target.  Dr. Gumpeni opined that the stippling was
inconsistent with “a self-inflicted gunshot wound” because most self-inflicted
gunshot wounds are “close contact, where the gun is placed directly against the
skin.”  He recovered a “bullet and jacket
fragments” from the complainant’s brain. 
On cross-examination, Dr. Gumpeni conceded that he could not exclude to
a “reasonable medical certainty” that the complainant’s death was not a suicide
or an accident.

HPD firearms
analyst Donna Eudaley testified that the .38 revolver recovered from Kelly
Kelso’s apartment fired the bullet fragment that Dr. Gumpeni recovered from the
complainant’s brain.  She noted that the revolver’s
“hammer block” and “rebound safety,” which prevent it from “discharging accidentally,”
were in working order and would prevent it from accidentally discharging if the
trigger was “accidentally knocked.”  On
cross-examination, Eudaley conceded that a person could accidentally discharge
the revolver if he had “his finger on the trigger” or “the hammer engaged and [attempted]
to disengage the hammer.”  Eudaley could
not determine whether the complainant’s shooting was “unintentional,” and she
noted that evidence of only one fired cartridge “could be consistent with
suicide.” 

Legal and Factual Sufficiency

          In
his first and second points of error, appellant argues that the evidence is
legally and factually insufficient to support his conviction because the “State
wholly failed to establish, beyond a reasonable doubt, that the complainant was
murdered.” 

          We
review the legal sufficiency of the evidence by considering all of the evidence
in the light most favorable to the verdict to determine whether any rational
trier of fact could have found the essential elements of the offense beyond a
reasonable doubt.  Williams v. State, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007)
(citing Jackson v. Virginia, 443 U.S.
307, 318–19, 99 S. Ct. 2781, 2788–89 (1979)).  In doing so, we give deference to the
responsibility of the fact-finder to fairly resolve conflicts in testimony, to
weigh evidence, and to draw reasonable inferences from the facts.  Id.  However, our duty requires us to “ensure that
the evidence presented actually supports a conclusion that the defendant
committed” the criminal offense of which he is accused.  Id.

          In
a factual sufficiency review, we view all the evidence in a neutral light, both
for and against the finding, and set aside the verdict if the proof of guilt is
so obviously weak as to undermine confidence in the jury’s determination, i.e.,
that the verdict seems “clearly wrong and manifestly unjust,” or the proof of
guilt, although legally sufficient, is nevertheless against the great weight
and preponderance of the evidence.  Watson v. State, 204 S.W.3d 404, 414–15
(Tex. Crim. App. 2006).  We note that a
jury is in the best position to evaluate the credibility of witnesses, and we
afford due deference to the jury’s determinations.  Marshall
v. State, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006).  Although we should always be “mindful” that a
jury is in the best position to decide the facts and that we should not order a
new trial simply because we disagree with the verdict, it is “the very nature
of a factual-sufficiency review that . . . authorizes an appellate court,
albeit to a very limited degree, to act in the capacity of a so-called
‘thirteenth juror.’”  Watson, 204 S.W.3d at 414, 416–17.  Thus, when an appellate court is “able to
say, with some objective basis in the record, that the great weight and preponderance of the (albeit legally sufficient)
evidence contradicts the jury’s verdict[,] . . . it is justified in exercising
its appellate fact jurisdiction to order a new trial.”  Id.
at 417.

A person commits the offense of
murder when he intentionally or knowingly causes the death of an
individual.  Tex. Penal Code Ann. § 19.02(b)(1) (Vernon 2003). 

In support of his legal sufficiency
challenge, appellant asserts that the evidence is “wholly circumstantial” and
no evidence shows that he “engaged in any act for which he could be held
criminally responsible.”  He emphasizes
that Dr. Gumpeni and Donna Eudaley could not rule out suicide and accidental discharge of the weapon and appellant’s “unusual behavior
[near the location of the complainant’s death] . . . adds nothing to this
Court’s evaluation of this Point of Error.” 


Viewing all of the evidence in the
light most favorable to the verdict, appellant, on February 7, 2008, at about
5:00 a.m., called for emergency assistance and told the operator that “three or
four black males” had “tried to come in here and rob us” and the robbers had
shot his girlfriend “Amy” in the head.  However,
Officer Montague testified that when he arrived at appellant’s apartment
shortly thereafter, he found numerous valuable electronics and narcotics lying about
undisturbed.  Investigator Verbitsky
testified that appellant’s apartment showed no sign of forced entry.  Most significantly, appellant, who had left
the apartment before calling for emergency assistance, took three guns,
including the .38 revolver that was the murder weapon, to Kelly Kelso’s apartment.  When appellant then returned to his apartment
complex, he continued walking when he saw Officer Montague even though he knew that
his girlfriend had been shot.  The
physical evidence contradicted appellant’s representation that a robbery had occurred.
 Moreover, his efforts to conceal the murder
weapon and avoid Officer Montague at the apartment complex indicate his
“consciousness of guilt.”  His attempt to
conceal incriminating evidence, his inconsistent statements, and his implausible
explanations “are probative of wrongful conduct and are also circumstances of
guilt.”  Guevara v. State, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).  Also, Dr. Gumpeni explained that the
complainant’s injury was inconsistent with suicide because of the “stippling.”  Moreover, firearm’s analyst Eudaley testified
that the .38 revolver had fully operational safety mechanisms and would likely not
have discharged accidentally.  Viewing
the evidence in the light most favorable to the verdict, a reasonable trier of
fact could have found beyond a reasonable doubt that appellant murdered the
complainant.  Accordingly, we hold that
the evidence is legally sufficient to support appellant’s conviction.

In support of his factual sufficiency
challenge, appellant again emphasizes that suicide and accidental discharge of
the weapon could not be ruled out and the State “relied upon circumstantial
evidence,” not direct evidence, to prove his guilt.  We note that circumstantial evidence is
probative of a defendant’s guilt and is sufficient by itself to establish
guilt.  Guevara, 152 S.W.3d at 49.

Dr. Gumpeni and firearms analyst Eudaley
did testify that suicide and accidental discharge could not be ruled out.  However, Dr. Gumpeni explained that the
complainant’s injury was “inconsistent” with suicide because of the “stippling,”
and Eudaley noted that the revolver’s safety mechanisms were fully operational,
making accidental discharge unlikely.  Moreover,
the physical evidence contradicted appellant’s representations that a robbery
had occurred.  Again, appellant took the
.38 revolver that fired the fatal shot and his other firearms to Kelso’s
apartment, and he tried to avoid Officer Montague when he returned to his
apartment.  See id. at 50.  We conclude
that the verdict is not “clearly wrong and manifestly unjust” and the proof of
guilt is not against the great weight and preponderance of the evidence.  See
Watson, 204 S.W.3d at 414–15. 
Accordingly, we hold that the evidence is factually sufficient to
support appellant’s conviction.

We overrule appellant’s first and
second points of error.

Evidentiary Issues

In his third, fourth, fifth, sixth,
and eighth points of error, appellant argues the trial court erred in admitting
certain evidence because it was hearsay, irrelevant, or “not supported in the
record.”

We review a trial court’s decision to
admit or exclude evidence under an abuse of discretion standard.  Rodriguez
v. State, 203 S.W.3d 837, 841 (Tex. Crim. App. 2006).  Therefore, we will not reverse a trial court
as long as its ruling was within the “zone of reasonable disagreement.”  Id.

Hearsay

In his third point of error, appellant
asserts that eleven hearsay statements made by the complainant were improperly
admitted into evidence over his objection. 
Prior to her death, the complainant had told Diane Smith, her
grandmother, that (1) she was unhappy living with appellant; (2) appellant “was
mean to her”; (3) “she was afraid of him and she didn’t know what he would do
if she tried to leave, but that’s what she wanted to do”; and (4) “that’s what
he will do to me,” demonstrated by “put[ting] her finger to her head” as if it
was a handgun.  The complainant had
written in her diary: (5) “All blamed on me. 
Going crazy.  I actually think
he’s going to kill me”; (6) “We fight and argue over everything that doesn’t
count”; (7) “I moved back in with Grandma because me and him aren’t doing that
good now”; and (8) Pro/con list.  “Pro: I
love him . . . con: Scared of him. . . . .” 
The complainant had told her neighbor, Stacy Chiapetta, that (9) “she was scared” and had
told Billie Simmons that (10) “she was scared” and “her boyfriend was mad,
angry and throwing a fit” and (11) “she wanted to move [in] with her
grandmother,” “she had moved some of her stuff,” and “she told [this to appellant].”  

In his fourth point of error,
appellant asserts that his statements made while he was sitting in Officer
Montague’s patrol car that “Is my girlfriend okay?,” “they kicked in the door,”
and “she was shot in the head” to Investigator Swainson were inadmissible
hearsay “in response to police questioning.”

A statement is hearsay if it is
“other than the one made by the declarant while testifying at the trial or
hearing, offered in evidence to prove the truth of the matter asserted.”  Tex. R.
Evid. 801.  Generally, hearsay is
not admissible except as provided by statute or the rules of evidence.  Tex. R.
Evid. 802.  A statement “relating
to a startling event or condition made while the declarant was under the stress
of excitement caused by the event or condition” or “of the declarant’s then
existing state of mind, emotion, sensation, or physical condition (such as
intent, plan, motive, design, mental feeling, pain, or bodily health), but not
including a statement of memory or belief to prove the fact remembered or
believed” is not excluded by the hearsay rule. 
Tex. R. Evid. 803(2), (3).  Further, an “admission by a party opponent,”
a party’s out-of-court statement that is “offered against the party,” is not
hearsay.  Tex. R. Evid. 801(e)(2). 


Appellant asserts that the
complainant’s statements were inadmissible as “statements of memory or belief
to prove the fact remembered or believed.” 
The State counters that the statements were excited utterances or
expressions of the complainant’s state of mind. 
With excited utterances, the “critical determination is whether the
declarant was still dominated by the emotions, excitement, fear, or pain of the
event or condition at the time of the statement.” Zuliani v. State, 97 S.W.3d 589, 596 (Tex. Crim. App. 2003)
(internal citations omitted).  Whereas,
the state of mind exception encompasses a declarant’s statements indicating
fear of or a desire to leave the defendant. 
Martinez v. State, 17 S.W.3d
677, 688 (Tex. Crim. App. 2000) (declarant’s statement that she was afraid of defendant
was statement of her then existing state of mind).  The trial court could have reasonably
concluded that the complainant’s statement that she “was scared,” uttered to Simmons while
the complainant was “crying” and appellant “was mad, angry and throwing a fit,” was an excited
utterance because appellant was acting angry and violent at the time of the
complainant’s declaration.  See Zuliani,
97 S.W.3d at 596.  The trial court could
have also reasonably concluded that the complainant’s other statements showed that
her state of mind was fearful of appellant. 
See Fain v. State, 986 S.W.2d
666, 680 (Tex. App.—Austin 1998, pet. ref’d). 
Accordingly, we hold the trial court did not err in admitting these
statements.

In regard to appellant’s remarks to Investigator
Swainson, Swainson testified that he did not ask appellant any questions.  Thus, the trial court could have reasonably
concluded that these voluntary statements made by appellant were “admissions by
a party opponent.”  See Tex. R. Evid.
801(e)(2).  Additionally, in his
telephone call for emergency assistance, appellant had asserted that the
complainant had been shot in the head during a robbery by four black males who
had broken into his apartment.  Thus, appellant’s
statements were cumulative of evidence already admitted without objection.  Accordingly, we hold that the trial court did
not err in admitting these statements.

We overrule appellant’s third and
fourth points of error.

Relevancy

In his fifth, sixth, and eighth points
of error, appellant asserts that the following evidence admitted against him is
not relevant: photographs and a diagram showing illegal narcotics in his living
room; weapons, other than the single one responsible for causing the
complainant’s death; and Investigator Swainson’s testimony during the
sentencing phase about appellant’s affiliation with the “Fresno Bulldog Gang.”  

Evidence that is not relevant is
inadmissible.  Tex. R. Evid. 402.  Relevant
evidence is “evidence having any tendency to make the existence of any fact
that is of consequence . . . more probable or less probable than it would be
without the evidence.”  Tex. R. Evid. 401.  Relevancy is determined by whether “‘a
reasonable person, with some experience in the real world, believes that the
particular piece of evidence is helpful in determining the truth or falsity” of
any fact of consequence.  Montgomery v. State, 810 S.W.2d 372, 376
(Tex. Crim. App. 1990) (op. on reh’g) (quoting United States v. Brashier, 548 F.2d 1315, 1325 (9th Cir.1976)).  The evidence does not have to prove or
disprove a particular fact; it is sufficient if the evidence provides “a small
nudge toward proving or disproving some fact of consequence.”  Stewart
v. State, 129 S.W.3d 93, 96 (Tex. Crim. App. 2004).  A crime scene photograph is almost always
relevant because it may show the manner in which the offense occurred.  See Chamberlain
v. State, 998 S.W.2d 230, 237 (Tex. Crim. App. 1999).  Nonetheless, relevant evidence “may be
excluded if its probative value is substantially outweighed by the danger of
unfair prejudice.”  Tex. R. Evid. 403.  The opponent of the evidence must demonstrate
that the negative attributes of the evidence substantially outweigh any
probative value.  Montgomery, 810 S.W.2d at 377.

Appellant asserts that no “drugs were
involved in the death of the complainant” and the photographs and diagram left
the jury “free to speculate about appellant’s use of drugs.”  The State counters that the photographs and
diagram were relevant to refute appellant’s defense that “someone shot [the
complainant] during a robbery.”  Evidence
of valuable narcotics left in plain view may tend to prove that a robbery was
not the motive for the shooting of a complainant.  See Guevara,
152 S.W.3d at 51.  Thus, the trial court
could have reasonably concluded that the photographs and diagram were relevant
to disproving appellant’s alternate theory of how the complainant was killed.  See
Chamberlain, 998 S.W.2d at 237.  Appellant does not explain how the negative
attributes of the photographs and diagram “substantially outweigh” any
probative value.  See Montgomery, 810
S.W.2d at 377.  We conclude that the
photographs and diagram were not unfairly prejudicial because no evidence
identified the narcotics as appellant’s. 
The only evidence regarding narcotics came from Diane Smith, who said
the complainant had used marijuana.  We
hold the trial court did not err in admitting the photographs and diagram of
the scene.

The State asserts that admission of all
three firearms, not just the murder weapon, recovered from Kelso’s apartment
was “necessary to show appellant’s consciousness of guilt and to refute his
defense” that the complainant died during “a robbery or from suicide.”  The firearms, viewed together, served to
disprove appellant’s theory that the complainant was shot during a robbery
because such valuable property would have been the target of any robbery.  See Guevara,
152 S.W.3d at 51.  Moreover, appellant’s
concealment of the murder weapon along with the other firearms shows a
consciousness of guilt, a relevant fact at issue.  Id.
at 50.  Thus, the trial court could have
reasonably concluded that the additional firearms were relevant.  

Appellant argues that the admission
of the firearms into evidence was unfairly prejudicial because the “jury was
free to speculate about Appellant’s possession of an arsenal of weapons”
creating a “negative impact” that was “impossible to ignore.”  However, Kelly Kelso testified, without
objection, that appellant left the three firearms in her apartment such that
evidence of appellant’s “arsenal,” if any, was already before the jury.  We conclude that the admission into evidence
of the additional two firearms did not create such negative impact to be unfairly
prejudicial.  

Appellant asserts that, at
sentencing, Investigator Swainson “did not possess the type of specialized
knowledge necessary” to offer evidence of the activities of the “Fresno Bulldog
Gang,” which was necessary for the jury to make “a fair evaluation of how gang
membership reflects on the gang member’s character.”  See
Beasley v. State, 902 S.W.2d 452, 457 (Tex. Crim. App. 1995) (evidence of
defendant’s membership in gang admissible if fact finder provided with evidence
of defendant’s gang membership and character and reputation of gang, not
required to determine if defendant committed bad acts or misconduct, and asked
only to consider reputation or character of accused.).  The State asserts that
appellant’s gang affiliation was “relevant to sentencing,” specifically as to
appellant’s “general reputation and character or extraneous crimes or bad
acts.” 

Investigator Swainson testified that
appellant had a tattoo just above his right ankle depicting four dog paws along
with the words “Fresno” and “Bulldog,” which identified “a gang in Fresno,
California,” but he did not testify about the gang’s activities.  The trial court instructed the jury,

You may consider evidence of an extraneous . . . bad
act in assessing punishment . . . However, you may consider such evidence only
if the extraneous . . . bad act has been shown by the State beyond a reasonable
doubt to have been committed by the defendant . . . .

 

Texas Code of Criminal Procedure article
37.07 governs the admissibility of evidence during the punishment stage of a
non-capital criminal trial.  Tex. Code Crim. Proc. Ann. art. 37.07 §
3(a)(1) (Vernon Supp. 2009); Erazo v.
State, 144 S.W.3d 487, 491 (Tex. Crim. App. 2004); Sierra v. State, 266 S.W.3d 72, 79 (Tex. App.—Houston [1st Dist.]
2008, pet. filed).  This section provides
that 

evidence may be offered by the [S]tate and the
defendant as to any matter the court
deems relevant to sentencing, including but not limited to the prior
criminal record of the defendant, his general reputation, his character, an
opinion regarding his character, the circumstances of the offense for which he
is being tried, and . . . any other
evidence of an extraneous crime or bad act.

 

Tex. Code
Crim. Proc. Ann. art.
37.07, § 3(a)(1) (emphasis added).  Thus,
the State has great latitude in offering evidence of “bad acts” during the punishment
phase.  Id.  Relevance in this
context is “more a matter of policy” than an application of Rule 401 and is
better determined by “what would be helpful to the jury in determining the
appropriate punishment.”  Garcia v. State, 239 S.W.3d 862, 865
(Tex. App.—Houston [1st Dist.] 2007, pet. ref’d) (citing Mendiola v. State, 21 S.W.3d 282, 285 (Tex. Crim. App. 2000) and Tex. R. Evid. 401).  Evidence of gang affiliation is relevant to
sentencing and may be introduced without satisfying the requirements set forth
in Beasley.  Sierra,
266 S.W.3d at 79.

          Appellant’s
tattoo of a “Fresno bulldog” constituted some evidence that he was a member of the
gang and was admissible under article 37.07 as probative of his character, even
without the State’s compliance with the requirements of Beasley.  Id. 
Thus, the trial court could have reasonably concluded that such evidence
of appellant’s gang affiliation was relevant in the punishment phase of the
trial.

          Appellant
argues that the gang affiliation evidence was more prejudicial than probative
because it allowed the jury “to speculate on what being a member of the ‘Fresno
Bulldog Gang’ meant.”  The probative
value of appellant’s gang affiliation was low since Investigator Swainson did
not testify about the gang’s activities. 
However, its prejudice was correspondingly low for the same reason.  Significantly, the trial court instructed the
jury that it could not consider the gang affiliation unless the State proved that
appellant committed an extraneous bad act by such affiliation beyond a
reasonable doubt.  See id. at 79–80.  The trial court’s instruction likely
curtailed the jury’s consideration of appellant’s gang membership more than a Beasley instruction would have.  See id.  Accordingly, we hold that the trial court did
not err in admitting evidence of appellant’s gang affiliation.

          We
overrule appellant’s fifth, sixth, and eighth points of error. 

Argument

          In
his seventh point of error, appellant argues that the trial court erred in allowing
the State in its guilt-phase argument to the jury to make certain statements
because they injected the personal opinion of the prosecutor into the case,
were outside the record, and shifted the burden of proof to appellant.  In his ninth point of error, appellant argues
that the trial court erred in overruling his motion for mistrial during the
punishment phase because the State’s argument “injected the idea that the jury
should assess a ‘worth’ to the complainant’s life.” 

Permissible jury argument is limited
to (1) a summation of the evidence; (2) a reasonable deduction from the
evidence; (3) answering argument of opposing counsel; or (4) a plea for law
enforcement.  Wesbrook v. State, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000) (en
banc).  The trial court has broad
discretion in controlling the scope of closing argument.  Lemos
v. State, 130 S.W.3d 888, 892 (Tex. App.—El Paso 2004, no pet.); see Herring v. New York, 422 U.S. 853,
862–63, 95 S. Ct. 2550, 2555–56 (1975).  The
State is afforded wide latitude in its jury arguments and may draw all reasonable,
fair, and legitimate inferences from the evidence.  See Allridge
v. State, 762 S.W.2d 146, 156 (Tex. Crim. App. 1988).  The State may also argue outside the record
in response to the defendant’s having done so, but may not stray beyond the
scope of the invitation.  See Wilson v. State, 938 S.W.2d 57, 60–61
(Tex. Crim. App. 1996) (en banc), abrogated
on other grounds, Motilla v. State,
78 S.W.3d 352 (Tex. Crim. App. 2002).  

          Appellant
first complains that the following State’s argument injected the prosecutor’s
“personal opinion” into the case and was “outside the record”:

Members of the jury, we know what happened in that room; [appellant] killed [the
complainant]. . . . We know from the
evidence that it wasn’t a suicide and we know
from the evidence that it wasn’t an accident.  Now, this investigation is maybe not perfect
but we brought you all the critical,
admissible evidence that you needed to render a verdict of guilty in this
case.  We are not withholding the statements that [appellant] made to you
because we’re trying to hide something from you.  

 

(Emphasis added).  A prosecutor may “argue his opinions
concerning issues in the case so long as the opinions are based on the evidence
in the record and not as constituting unsworn testimony.”  McKay
v. State, 707 S.W.2d 23, 37 (Tex. Crim. App. 1985).  Dr. Gumpeni testified that the complainant’s
injury was “inconsistent” with suicide.  Firearms
analyst Eudaley testified that the .38 revolver’s safety mechanisms were in proper
working order such that unintentional discharge was unlikely.  Thus, even as opinions, the State’s arguments
were based on permissible reasonable deductions from the evidence.  See
Wesbrook, 29 S.W.3d at 115.  

          The
State’s argument that it was not withholding appellant’s statements was a
direct response to appellant’s trial counsel’s argument that 

And the journal? 
Where’s the journal?  Why did they
want to hide that from you?  They brought
a few pages from the journal. . . . Ask yourself those questions. . . . Where
are [appellant’s three] statements?  We
can’t bring those in evidence.  That’s
their burden.  Why are they hiding that
from you?  Why didn’t they want you to
know what he said?  That’s critical. . .
. And they didn’t bring it to you.

 

Thus, this argument, too, was within
the permissible scope of argument.  See id.

          Appellant
next complains that the following argument by the State “shifted the burden of
proof” to appellant and the State did not tell the jury that “appellant was not
required to present evidence”:

In response to [appellant’s trial counsel’s] argument
that we didn’t offer the entire diary or [appellant’s] statements, let me point
out that [trial counsel] could have attempted to bring those to you.

 

Appellant’s trial counsel had argued,
as noted above, that the State appeared to be “hiding” evidence from the
jury.  The State’s arguments, in rebuttal
of appellant’s trial counsel’s arguments, were permissible and did not shift
the burden of proof to appellant.  See Jackson
v. State, 17 S.W.3d 664, 674 (Tex. Crim. App. 2000) (State’s argument that
defense could have called expert to dispute State’s evidence did not
impermissibly shift burden because argument was response to defendant’s argument
that State’s evidence was lacking).

          Appellant
finally complains that the following arguments allowed the State to
impermissibly “bring evidence outside the record to the jury”:

(1)            
[The caller to
emergency assistance] identifies the victim as my girlfriend Amy.  Well, we all know that [appellant’s] girlfriend
is [the complainant].

 

(2)            
Both of ‘em –
both of the gunshot residue reports are inconclusive on [appellant] and [the
complainant].  But they both have
particles on their hands.  What does that
mean?  That means they were both around a
fired gun.  They both had particles on
their bodies consistent with gunshot residue.

 

(3)            
. . . you’ve got
the Medical Examiner who tells you that it is no accident and it is not
suicide.

 

(4)            
You learned that
[the complainant] was afraid of [appellant] . . . Arguably, the honeymoon phase
of any kind of a new relationship.  You
move in together, you’re exploring all kinds of new things about each
other.  But not [appellant] and [the
complainant], they fought over everything.

 

(5)            
. . . they live
with the men that they’re afraid of, that they love.  They live with them day in and day out and
they know exactly what they’re capable of. 
And in this case [the complainant] was trying everything she could to
get back to her grandma’s house without [appellant] knowing, before she could
tell him –

 

As to the State’s first argument,
Stacy Chiapetta, the complainant’s neighbor, identified appellant as the caller
on the recording of the telephone call for emergency assistance.  Thus, appellant’s contention that “[t]here
has never been any evidence on the record that that’s [appellant’s] voice on
the 911 tape” is without merit.  See Wesbrook,
29 S.W.3d at 115.  

As to the State’s second argument, William
Davis, Manager of Trace Evidence for the Harris County Medical Examiner, testified
that if the gunshot residue tests on appellant and the complainant had been
positive, it could mean that a “person was in the presence of where a weapon
was fired.”  He did not testify that the
“inconclusive” tests indicated that appellant and the complainant had been
around a fired gun.  However, other
evidence previously noted affirmatively linked appellant to the murder weapon,
such that any error made by the trial court in allowing the argument would be harmless.

Regarding
the State’s third argument, Dr. Gumpeni did not testify that the complainant’s
death was “no accident” but, rather, that he could not exclude the possibility
that the complainant’s injury was inflicted as a result of an accident.  However, firearms analyst Donna Eudaley did
testify that the .38 revolver’s safety mechanisms were fully functional and the
firearm did not likely discharge unintentionally, even if the trigger had been
“accidentally knocked.”  Thus, the
State’s argument was a reasonable deduction from all the evidence admitted at
trial.  See id. 


Regarding
the State’s fourth argument, appellant asserts that no evidence showed “that [appellant
and the complainant] fought over everything.” 
However, the complainant’s January 14, 2008 diary entry clearly stated,
“We fight and argue over everything.” 
Thus, the State’s argument was a reasonable deduction from the
evidence.  

As to the State’s
fifth argument, appellant asserts that no evidence showed that the complainant
was “trying to get back to her grandmother’s house.”  Diane Smith and Investigator Swainson
testified that they found the complainant’s personal belongings at Smith’s
apartment after her murder.  Billie Smith
testified that the complainant had told appellant that she wanted to move back
in with Smith.  The State’s argument was,
thus, a reasonable deduction from the evidence. 


Appellant finally asserts that the
State’s impermissible argument during the punishment phase that “Your verdict puts
a value on [the complainant’s life]” was not cured by the trial court’s
instruction to disregard and the trial court should have granted his motion for
mistrial.  During his closing argument, appellant’s
trial counsel suggested a twenty year sentence for appellant when he argued,
“When I think about things, I am going to start off with [twenty] years.  Just say [twenty] years as a benchmark.  Is [twenty] years a really long time?”  In its closing argument, the State responded,

[Twenty] years ago, [the complainant] was born.  When you think about [twenty] years, think
about the fact that [the complainant] only got to live on this Earth with her
family and her friends for [twenty] years and because of [appellant], they will
never get her back in their lives again. 
Is [twenty] years really enough? 
The effect of your verdict has greater impact than just on
[appellant].  Your verdict puts a value
on [the complainant’s] life.

 

Appellant’s trial counsel objected to
this argument, and, after the trial court sustained the objection, asked for an
instruction to disregard and moved for mistrial.  The trial court instructed the jury,
“Disregard the last comment and don’t consider it for any purpose,” but did not
rule on appellant’s motion.”[3]  

          A
mistrial is an extreme remedy for prejudicial events occurring during the trial
process.  See Archie v. State, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007).  We review the denial of a motion for mistrial
for an abuse of discretion.  Hawkins v. State, 135 S.W.3d 72, 77 (Tex. Crim.
App. 2004).  In our review, we balance
three factors: (1) the severity of the misconduct (the magnitude of the prejudicial
effect of the prosecutor’s remarks); (2) the measures adopted to cure the
misconduct (the efficacy of any cautionary instruction by the judge); and (3)
the certainty of conviction/punishment absent the misconduct (the strength of
the evidence supporting the conviction).  See
Archie, 221 S.W.3d at 700; Mosley v.
State, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998). 

          The
State’s argument was improper because it asked the jury to “value” a life and
did not fall within one of the four general permissible categories of
argument.  See Tidmore v. State, 976 S.W.2d 724, 731 (Tex. App.—Tyler 1998,
pet. ref’d).  In Tidmore, the court held improper the State’s argument that “What’s
a human life worth? . . . If it were a member of your family . . . , how would
you feel about ten years probation? Five years probation? Two years probation?
Would you think that was enough? . . . But I think a human life . . . is
certainly worth twenty years.”  Id. 
In this case, the State was responding to appellant’s trial counsel’s
suggested twenty-year sentence for appellant. 
Moreover, the prejudicial effect of the comment was not significant as
the statement was only one point made in an eleven page argument.  The trial court’s instruction to disregard
was clear, and it further instructed the jury that “you may take into
consideration all the facts shown by the evidence admitted before you in the
full trial of this case.”  In addition to
the evidence presented during the guilt phase, evidence presented at sentencing
about appellant’s other bad acts, including his involvement in another shooting
and a physical altercation, evading arrest, concealing evidence, and gang
affiliation, supported the jury’s conclusion that a sentence of twenty years
was insufficient.  We conclude that the
State’s argument was not so egregious that, in its absence, appellant would not
have received the same sentence.  Balancing
the three factors, we hold that the trial court did not err in denying
appellant’s motion for mistrial.

          We
overrule appellant’s seventh and ninth points of error.

Jury Charge

In his tenth point of error,
appellant argues that the trial court erred in instructing the jury that it
could consider the prior relationship between the complainant and appellant because
it “improperly expanded the 803(3) evidence [about the state of mind of the
complainant] into a ‘38.36 charge.’”  See Tex.
R. Evid. 803(3); Tex. Code Crim.
Proc. Ann. art. 38.36(a) (Vernon 2005).  

We first decide whether jury charge error
exists.  Middleton v. State, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003).  If we find error, reversal is required when
the defendant has properly objected to the charge and we find “some harm” to
his rights, that is, “the error appearing from the record was calculated to
injure the rights of defendant.”  Tex. Code Crim. Proc. Ann. art. 36.19
(Vernon 2006); Abdnor v. State, 871
S.W.2d 726, 731–32 (Tex. Crim. App. 1994). 

The trial court instructed the jury in
pertinent part,

. . . you may consider all relevant facts and
circumstances surrounding the death, if any, and the previous relationship
existing between the accused and the deceased, together will all relevant facts
and circumstances going to show the
condition of the mind of the accused and/or the decedent at the time of the
offense, if any.

 

(Emphasis added.). Appellant objected
to the portion of the charge stating “the condition of the mind of the accused
and/or the decedent” on the ground that there was “no article 38.36 evidence”
regarding appellant, and he requested that the trial court delete the reference
to “the accused and/or.”  The trial court
denied the request.  

Article 38.36 provides that “[i]n all
prosecutions for murder, the state or the defendant shall be permitted to offer
testimony as to all relevant facts and circumstances surrounding the killing
and the previous relationship existing between the accused and the deceased,
together with all relevant facts and circumstances going to show the condition of the mind of the accused
at the time of the offense.”  Tex. Code Crim. Proc. Ann. art. 38.36(a) (emphasis added).  Texas Rules of Evidence 803(3) allows
evidence of the complainant’s state of mind. 


Here, the
trial court’s instruction was technically in error because it varied from the
statutory language and expanded the scope of the language of article 38.36 to
include the complainant’s state of mind. 
However, appellant’s proposed instruction, which would have instructed
the jury to consider such evidence only in regard to the complainant’s state of
mind, would not have cured the error.  The
trial court admitted the complainant’s statements to show her state of mind and
“to give a contextual relationship.”  Because
article 38.36 allows evidence as to the previous relationship between appellant
and the complainant and Rule 803(3) allows evidence of the complainant’s state
of mind, we conclude that there could be no harm to appellant’s rights from the
erroneous jury instruction.

We overrule
appellant’s tenth point of error.

Conclusion

          We
affirm the judgment of the trial court.

 

 

 

                                                                             Terry
Jennings

                                                                             Justice

 

Panel
consists of Justices Jennings, Hanks, and Bland.

 

Do
not publish.  Tex. R. App. P. 47.2(b).











[1]           See
Tex. Penal Code Ann. §
19.02(b) (Vernon 2003).

 





[2]           See
Tex. Code Crim. Proc. Ann. art.
38.36(a) (Vernon 2005).

 





[3]           Appellant asked for an instruction to
disregard and for a mistrial in the same request.  The trial court responded with an instruction
to disregard and then stated, “You may continue.”  While this may not be an explicit overruling
of the motion for mistrial, we construe it as sufficient for the trial court to
have implicitly overruled appellant’s motion such that he has preserved
error.  See Crocker v. State, 248
S.W.3d 299, 303–04 (Tex. App.—Houston [1st Dist.] 2007, pet ref’d) (defendant
preserved error where trial court answered his joint request for instruction to
disregard and motion for mistrial with “Denied”).